**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**TONY KEITH RICHARDSON,**

  **Plaintiff,**

**v.**                                                    **Case No.: 2:14-cv-13354**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

  **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 14, 15).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED;** that the Commissioner's motion for judgment

on the pleadings be **GRANTED;** that the decision of the Commissioner be **AFFIRMED;** and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.     Procedural History

On January 6, 2011, Plaintiff, Tony Keith Richardson ("Claimant"), filed an application for DIB, alleging a disability onset date of April 26, 2010, due to "back and neck injury; numbness and tingling in legs and arms; high blood pressure; and fibromyalgia." (Tr. at 178, 214). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 76, 89). Claimant filed a request for an administrative hearing, (Tr. at 96), which was held on October 3, 2012, before the Honorable Jack Penca, Administrative Law Judge ("ALJ"). (Tr. at 32-70). By written decision dated October 12, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 13-25). The ALJ's decision became the final decision of the Commissioner on January 28, 2014, when the Appeals Council denied Claimant's request for review. (Tr. 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 10, 11), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 14, 15). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 48 years old at the time he filed the instant application for benefits, and 50 years old on the date of the ALJ's decision. (Tr. at 13, 178). He has at least a high school education and communicates in English. (Tr. at 23, 40, 213, 215). Claimant's past

2

relevant work includes maintenance supervisor, cable installer, rock truck driver, and delivery manager. (Tr. at 23).

### III.  Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments

3

prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 15, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since April 26, 2010. (*Id.,* Finding No. 2). Although Claimant's earnings record revealed income after the alleged disability onset date for the third and fourth quarters of 2010 and the first and second quarters of 2011, Claimant testified at the administrative hearing that this income constituted Worker's Compensation benefits rather than gainful employment. At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "chronic back pain and chrondromalacia." (Tr. at 15-19, Finding No. 3). The ALJ also considered Claimant's other impairments, including headaches, acute rhinitis, nicotine abuse, history of fibromyalgia, hypertension, mixed hyperlipidemia, major depressive disorder

4

and pain disorder, but found them to be non-severe. (*Id.*)

Under the third inquiry, the ALJ ascertained that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 19,  Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except he can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl and never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to extreme cold, vibration, and unprotected heights.

 (Tr. at 20-23, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform his past relevant work. (Tr. at 23, Finding No. 6).  Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 23-24, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1962 and was defined as a younger individual age 18-49 on the alleged onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that the Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 23, Finding Nos. 7-9). Given these factors, Claimant's RFC, and with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 23-24 Finding No. 10). At the unskilled light exertional level, Claimant could work as a small part assembler, stocker, or laundry worker; and at the unskilled sedentary level, Claimant could work as a shipping and receiving router, information clerk, or stationary guard. (Tr. at 23-24). Therefore, the ALJ found that Claimant was

not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 24, Finding No. 11).

IV.   **Claimant's Challenge to the Commissioner's Decision**

Claimant argues that the decision of the Commissioner is not supported by substantial evidence for three reasons. First, Claimant asserts that he meets Listing 1.04, disorders of the spine, and Listing 1.02, dysfunction of a joint; therefore, the ALJ erred at step three of the sequential evaluation process. (*Id.* at 11-13). Claimant maintains that the clinical findings on record confirm the presence of radiculopathy related to abnormalities of his cervical and lumbar spine; and objective MRI findings show disc herniation/protrusion in the lumbar and cervical spine, nerve root compression, foraminal narrowing of the L4-L5, and moderate central canal stenosis. Claimant also points to knee MRI findings of chondromalacia patella and partially torn anterior cruciate ligament, which bolster his complaint of chronic knee pain and functional limitation. (*Id.* 11-13).

Second, the ALJ improperly weighed the medical source opinions, failing to give controlling weight to the opinions of Claimant's treating physician, Dr. Matthew Ranson. (ECF No. 14, at 10-11). Claimant emphasizes that Dr. Ranson is his pain management physician and "marshaled" all of Claimant's medical care with respect to his back, neck, and knee conditions. Additionally, Claimant argues that, as his primary caregiver, Dr. Ranson was in the best position to determine Claimant's residual functional limitations. (*Id.* at 11). Dr. Ranson opined that Claimant could not lift and carry over ten pounds; could only stand and/or walk for two hours in an eight-hour work day; had push and pull limitations; and could never crawl. Yet, the ALJ discredited these opinions, claiming that they were inconsistent with the medical record. (*Id.* at 10-

6

11). Claimant adds that the ALJ erred by not specifically identifying the alleged inconsistencies and properly reconciling them, or alternatively, by not calling a medical expert to review and evaluate the record to determine if inconsistencies were indeed present. (*Id.* at 11).

Third, Claimant contends that, when posing hypothetical questions to the vocational expert, the ALJ failed to consider the exertional and non-exertional limitations documented in the Medical Source Statement prepared by Dr. Ranson. (*Id.* at 13-15). According to Claimant, the ALJ's hypothetical questions failed to take into account all of his back, neck, and knee limitations. (*Id.* at 14-15). Instead, the ALJ erroneously found that Claimant had the residual functional capacity to perform light work and could occasionally crawl. (*Id.* at 13). As a result, the ALJ incorrectly concluded that Claimant was capable of performing the light exertional level jobs offered by the vocational expert. (*Id.* at 14-15).

In response, the Commissioner argues that the medical evidence does not demonstrate the presence of musculoskeletal impairments sufficiently severe and functionally limiting to meet all of the criteria of the Listings 1.02 and 1.04. (ECF No. at 11-12.). In particular, the Commissioner stresses that in order to meet Listing 1.02A, the claimant must show a gross anatomical deformity, along with chronic joint pain and stiffness, and an inability to ambulate effectively. Additionally, to meet Listing 1.04, claimant must demonstrate a spinal disorder that compromises a nerve root, or the spinal cord, and also is associated with nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication, causing an inability to ambulate effectively. (*Id.* at 11-15). Claimant failed to establish the presence of all of these conditions and symptoms.

With respect to the medical source opinions, the Commissioner maintains that the ALJ fully complied with applicable Social Security regulations and rulings in how he reviewed, analyzed, weighed, and discussed the opinions. (*Id.* at 17-19 ). The Commissioner points out that the ALJ acted well within his authority to reject Dr. Ranson's opinions, because they were inconsistent with other substantial evidence in the record; for instance, Dr. Ranson's lifting, sitting, standing, and walking restrictions were contradicted by the opinions of Dr. Mukkamala and Claimant's physical therapist, Mr. Murray. (*Id.*at 18). Moreover, the Commissioner argues that Dr. Ranson failed to support his opinions with medical evidence. (*Id.* at 18-19).

Finally, the Commissioner contends that the hypothetical questions presented to the vocational expert correctly reflected Claimant's RFC findings in that the ALJ placed numerous limitations on light work; including, kneeling, crouching, climbing, and crawling. The Commissioner argues that the record supports the ALJ's physical RFC assessment and therefore the ALJ correctly relied upon the vocational expert's testimony in response to hypothetical scenarios incorporating the RFC findings. Accordingly, the Commissioner claims that the ALJ acted properly by accepting the jobs identified by the vocational expert as ones that Claimant was capable of performing, and by concluding that Claimant was not disabled under the Social Security Act. (*Id.* at 15-17).

## V.   Relevant Medical History

While the undersigned has reviewed all evidence of record, only the medical information most relevant to the disputed issues is summarized below:

### A.  Treatment Records

On April 16, 2010, Claimant presented to his family physician, Dr. Ronald

Stollings, with complaints of right knee pain. Claimant told Dr. Stollings that the pain began two months earlier and was accompanied by a dull ache, increased pain when climbing stairs, instances of the knee giving out, and crepitation. (Tr. at 641). His current medical problems included herniated lumbar disc, hip and leg pain, low back pain, radiculitis due to displacement of lumbar disc, and stiff neck. (Tr. at 641-42). A physical examination revealed that Claimant had a normal gait, with a normal range of motion in all major muscle groups, and without limb or joint pain on range of motion testing. (*Id.* at 642). Claimant was referred to Dr. Molina for knee pain and provided Lyrica for leg pain. (Tr. at 643).

On April 26, 2010, Claimant presented to Charleston Area Medical Center's Emergency Department after suffering a work-related injury. (Tr. at 303). Claimant reported that he was driving a dump truck with the bed of the truck raised when the jacks suddenly gave away, causing the bed to come crashing down and severely jolting him. He complained of pain in the neck; pain in the mid, upper, and lower back, with the worse pain located in the lower back; and a slight tingling in his hands and feet. (*Id.*). Claimant reported a prior medical history of hypertension and chronic back pain with questionable neuropathy. (*Id.*). A physical examination revealed that Claimant's head was atraumatic and non-tender; his neck was restrained with no stridor, mass, or point tenderness over the spine; however, there was slight paraspinal tenderness bilaterally. Examination of the back revealed no deformity, although there appeared slight paraspinal tenderness to the mid and low back. The examination was negative for point tenderness over the spine, and Claimant's extremities was unremarkable. Claimant was able to demonstrate of full range of motion in all joints. (Tr. at 304). The Emergency Physician, Dr. William Payne, ordered radiology studies of Claimant's head;

cervical, lumbar, and thoracic spine; pelvis; and chest. A CT scan of the head was negative. (Tr. at 306). X-rays of the chest and pelvis were negative. (Tr. at 308-09). A CT scan of the cervical spine showed normal alignment with no evidence of fracture, dislocation, or subluxation. There was congenital nonunion of the base of the spinous process at the T1 level that was unchanged from a prior study. There was no evidence of prevertebral soft tissue fullness. (Tr. at 307). X-rays of the lumbar and thoracic spine were normal. (Tr. at 310-11). Claimant was diagnosed with cervical and thoracolumbar strain, status post vehicle accident; and hypertension. (Tr. at 305). Dr. Payne prescribed Lortab, Flexeril, and Naprosyn and provided a referral to H.S. Ramesh, M.D., a specialist in pain medicine, physical medicine, and rehabilitation. Dr. Payne advised Claimant to apply heat to his neck and back and to remain off work for two days. (*Id.*).

Claimant presented to Dr. Ramesh on April 29, 2010 with complaints of neck and back pain as a result of the work-related injury. (Tr. at 691). At this examination, Claimant complained of low back pain that radiated into the bilateral hips, thighs, knees, calves, and feet. Claimant reported his pain level was 8 out of 10 at rest; however, upon prolonged sitting, bending, lifting, or twisting, the pain level increased to 10. He also reported numbness and tingling in the lower extremities, although he denied leg weakness. (*Id.*). Claimant reported neck pain that radiated to the bilateral shoulders, elbows, and occipital regions. Claimant relayed a past history that included a right knee meniscal injury, as well as a recent physical assault in which he was hit in the left shoulder and head, causing a concussion. His current medical problems included hypertension, bladder problems which began two years prior, and chronic right knee pain. (Tr. at 692). Dr. Ramesh performed a musculoskeletal evaluation. The cervical evaluation showed reduced range of motion with flexion at thirty degrees; extension at

forty-five degrees; and rotation to the right at fifty-five degrees and fifty to the left. There were trigger points present over the bilateral trapezius along with tender bilateral cervical facet and thoracic facet joints. Evaluation of the lumbar spine was negative for scoliosis. The lumbar range of motion was reduced. Straight-leg raising in the sitting position was negative at fifty-five degrees on the right and sixty degrees on the left. (Tr. at 693). Straight-leg raising in the supine position was negative at sixty degrees on the right and sixty-five degrees on the left. There was tenderness over the bilateral sacroiliac joint and lumbar facet joints. Claimant's gait was antalgic; however, he was able to walk on his toes and heels, with pain, and could squat. (Tr. at 693-694). Claimant's lower extremities showed decreased range of motion in the bilateral hips, knees, and ankles. MMT of the bilateral lower extremities was 4-5/5 in all muscle groups tested. (Tr. at 694). Dr. Ramesh diagnosed Claimant with lumbosacral and cervical strain/sprain; headache, not otherwise specified; bilateral sacroiliac dysfunction; lumbago; and dizziness. He prescribed physical therapy three times a week for a total of four weeks, ultrasound treatment for the SI joint, and a trial of cervical traction. (*Id.*). Claimant was prescribed Naprelan along with Norco and told he could return to work in four days with modified duties; specifically, he should limit lifting, pushing, and pulling to no more than ten pounds, and he should not drive a company vehicle. Dr. Ramesh also advised Claimant that he could perform office work. Dr. Ramesh asked to be notified if Claimant's employer did not have any light duty available. (Tr. at 694, 726). Claimant was advised to follow up in two weeks.

On May 3, 2010, Claimant completed a Patient Questionnaire at Boone Memorial Hospital regarding his work injury. Claimant indicated that he had not worked since his injury the month before, because he could not perform work duties, or leisure and

household activities, or he was unable stand for long periods of time. (Tr. at 427). On a "perceived" functional pain rating form, Claimant reported that he could not run; he could sit, stand, or crawl between six and fifteen minutes; and he could walk and drive between sixteen and thirty minutes. (Tr. at 428). Claimant also indicated he was able to perform his personal care, although he had to proceed slowly and carefully noting the activities caused extra pain. (Tr. at 428). He also indicated that pain prevented him from sleeping more than six hours at night, and he could only sleep well when he took medication. (*Id.*).

The following day, Claimant completed a back evaluation form in which he described his main complaint as pain in his neck, back, thoracic region, and both hips, with accompanying headaches. (Tr. at 425). A physical examination revealed that Claimant had guarded mobility upon palpation, but was otherwise a healthy male. Claimant also showed decreased lumbar lordosis, an antalgic gait, and he held his head forward. (*Id.*). However, Claimant's rehabilitation potential was assessed as good, and he began physical therapy on May 5, 2010. (Tr. at 426).

Claimant received physical therapy at Boone Memorial Hospital from May 5, 2010 through July 26, 2010, completing over thirty treatments for pain in his neck and back. (Tr. at 430-443). At his first session, Claimant did not have any new complaints and reported decreased pain. (Tr. at 430). For a majority of the sessions, Claimant tolerated the treatment well with some instances of decreased pain with treatment. (Tr. at 430, 432, 434, 435, 436). Jason Huffman, MPT, reported to Dr. Ramesh on May 14, 2010, that Claimant was currently experiencing a pain level of 4 out of 10 in his neck and 7 out of 10 in his low back. Claimant also reported feeling a constant tingling in his arms and feet, describing the feeling as if his arms and feet were "asleep." (Tr. at 444).

12

Claimant felt his neck pain had decreased more than his low back pain. Mr. Huffman observed that Claimant moved with a slow, deliberate antalgic movement pattern. Mr. Huffman recommended Claimant continue with physical therapy to help with increasing his range of motion and strength and decreasing pain. (Tr. at 444). At the May 28, 2010 session, Claimant reported that his pain had decreased, but his back was still stiff and sore. (Tr. at 434). Mr. Huffman noted on June 23, 2010 that Claimant stated he was doing better although he continued to have pain in the cervical and lumbar regions. Claimant generally tolerated physical therapy well and had less pain and increased mobility. (Tr. at 556). On June 25, 2010, Mr. Huffman reported to Dr. Ramesh that Claimant's current pain level was 7 out of 10, located at the cervical and lumbar regions. The pain was accompanied by stiffness and rigidity in the lumbar region. Claimant remained restricted for strength and functional endurance and had other limitations that prevented him from performing his full work duties. Mr. Huffman recommended that Claimant continue physical therapy for another three to four weeks. (Tr. at 445). Mr. Huffman updated Dr. Ramesh again on July 26, 2010, reporting that Claimant's current pain level was 4-7 out of 10, located in the neck and lumbar regions. (Tr. at 446). Claimant continued to exhibit guarded mobility with a flexed lumbar posture. Claimant continued to have functional mobility limitations. Mr. Huffman recommended three to four more weeks of physical therapy. (Tr. at 446).

During this time period, on May 10, 2010, Claimant presented to Boone Memorial Hospital for an MRI of the right knee due to pain with swelling and to rule out a tear. Old records showed that Claimant had previously been evaluated in 2008 for knee pain, which had persisted over two months. (Tr. at 531). An MRI completed on February 3, 2009 showed small joint effusion; intact anterior and posterior cruciate

ligaments; intact medial and lateral collateral ligaments; and a grade I signal abnormality within the lateral meniscus and the posterior horn of the medial meniscus with no complete meniscal tear. (Tr. at 539). Dr. Robert Davis, M.D., reviewed the May 2010 imaging, noting that the MRI showed a chondromalacia patella, probably grade four, with a small associated joint effusion and as partial interstitial tear of the anterior cruciate ligament. (Tr. at 406-407). By report of same date, Claimant underwent a venous study at Premier Imaging & Intervention performed by Mark S. Younis, M.D. Dr. Younis felt the study was negative for deep vein thrombosis. (Tr. at 660).

Claimant returned to Dr. Ramesh on May 14, 2010 reporting that his neck and back pain had decreased by ten percent since his initial visit. Claimant reported that he was able to work and could tolerate the pain as long as he took his prescribed medication. (Tr. at 753-754). However, Claimant reported he was not working at the time, because his employer had refused to modify his work duties. (Tr. at 722, 754). Claimant's physical examination remained unchanged. Dr. Ramesh diagnosed Claimant with lumbosacral and cervical strain/sprain; headache, nos; bilateral sacroiliac dysfunction; lumbago; and dizziness. Dr. Ramesh recommended continued physical therapy. (Tr. at 754). Furthermore, Claimant was advised to discontinue all over-the-counter medications. He was provided with a prescription for Diclofenac Sodium (Voltaren), and an order for a MRI of the lumbosacral and cervical spine. Claimant was excused from work until May 27, 2010. (Tr. at 722-724, 755).

On May 22, 2010, Claimant underwent an MRI of the cervical and lumbar spine at Saint Francis Hospital. MRI of the cervical spine revealed degenerative changes, as well as a superimposed moderate size disc protrusion at C4-C5 on the left. There was also associated canal stenosis encroaching upon the spinal cord and probable signal

14

changes in the spinal cord. (Tr. at 898). The MRI of the lumbar spine revealed degenerative changes and a superimposed small to moderate size broad-based disc protrusion at L4-L5 in the right. (Tr. at 897-98).

Claimant returned to Dr. Ramesh on June 1, 2010, reporting no change in his pain level. He continued to complain of tingling and numbness in both upper and lower extremities, bilaterally. Claimant's diagnosis remained the same, and his medication regimen included Flexeril and Norco. Dr. Ramesh recommended continued physical therapy, as well as time off work until June 25, 2010. Dr. Ramesh requested authorization from Workers' Compensation for medial branch block injections of the right C4-C5, C5-C6, C6-C7 cervical facet joints and the L3-L4, L4-L5, and L5-S1 lumbar facet joints. (Tr. at 687, 719-20, 751-53).

Less than one month later, Claimant returned to Dr. Ramesh for follow-up, again reporting no change in his pain level. (Tr. at 749-51). On examination, Claimant's range of motion of the neck and lumbar regions was also unchanged. Dr. Ramesh recommended continued physical therapy, ultrasound treatment of the sacroiliac joint, and a T.E.N.S. unit. (Tr. at 750-51). Claimant was told to return in seven to ten weeks for an EMG and NCV study. He was told that he could return to work on June 28, 2010, with modified duties that included limiting his lifting, pushing, and pulling to no more than twenty five pounds. Dr. Ramesh requested authorization for lumbar and cervical facet joints injections. To help Claimant return to work, Dr. Ramesh prescribed Norco for pain relief. Dr. Ramesh documented that this narcotic was medically necessary to control Claimant's pain given that he had not responded to traditional nonsteroidal anti-inflammatory drugs and muscle relaxers. (Tr. at 684, 717-19, 751).

Claimant presented to Dr. Ramesh on July 9, 2010 for bilateral lower extremity EMG and NCV studies. Dr. Ramesh interpreted both studies to be within normal limits. (Tr. at 747-748). Claimant's neck and lumbar range of motion remained unchanged, and his straight-leg raising was negative on the right side at fifty degrees and on the left side at fifty-five degrees, seated, and on the right side at fifty and the left side at sixty degrees in the supine position. The right sacroiliac and lumbar facet joints were tender. (Tr. at 748). Claimant's current medication regimen included Flexeril, Diclofenac Sodium, Norco, and Lyrica. Claimant was advised to remain off work until July 26, 2010. (Tr. at 747-49).

Claimant returned to Dr. Ramesh on July 26, 2010. He reported that he could tolerate the pain as long as he took the prescribed pain medication. Claimant's range of motion in his neck and lumbar spine was unchanged. His straight-leg raising was negative bilaterally at fifty degrees, seated, and bilaterally at sixty degrees in the supine position. Dr. Ramesh recommended that a functional capacity evaluation be scheduled, followed by work conditioning to progress to work hardening. (Tr. at 745-46). Claimant remained on Diclofenac Sodium, Flexeril, and Norco. Claimant was diagnosed with persistent lumbosacral and cervical strain/sprain; headache, nos; bilateral sacroiliac dysfunction; lumbago; and dizziness. (Tr. at 746). He was advised to remain off work until August 10, 2010. Dr. Ramesh continued to wait for authorization from Workers' Compensation to perform lumbar facet medial branch block injections. (Tr. at 747).

On August 10, 2010, Claimant underwent bilateral L3-L4, L4-L5, and L5-S1 lumbar facet medial branch block injections performed by Dr. Ramesh. Upon completion of the injections, Claimant's range of motion was improved. (Tr. at 710-11, 831). Still, Claimant was advised to remain off work until August 24, 2010. (Tr. at 832).

On August 16, 2010, Hugh C. Murray, PT, of Charleston Physical Therapy, performed a work conditioning evaluation of Claimant at the request of Dr. Ramesh. (Tr. at 342-44). Claimant reported symptoms of right back and buttock pain that radiated into the thigh, knee, and calf, and that began on April 26, 2010 after a work-related injury. He had not returned to work since the injury. Claimant had received physical therapy and trigger point injections, along with pain medication, muscle relaxers, and anti-inflammatory medications. Claimant reported he still had pain that was exacerbated with walking, bending forward, sitting, and rising from a seated position. Claimant's lumbar active range of motion for flexion was found to be within normal limits; his extension was less than twenty-five percent of normal; his side gliding standing to the right was twenty-five percent of normal and to the left was seventy-five percent of normal. (Tr. at 342). With regard to muscle strength, left hip flexion, left and right knee flexion, left and right dorsiflexion, and left and right plantar flexion, all were measured as five out of five. (Tr. at 342-343). Right hip flexion and right knee extension were four out of five. (Tr. at 342). Claimant declined the toe walk test, indicating that he did not feel confident walking on his right leg. Straight-leg raising while seated produced back pain on the right; however, there was no effect on the left side. (Tr. at 343). Mr. Murray opined that these signs and symptoms indicated a significant posterior lateral disc bulge although the diagnosis would need to be confirmed. (*Id.*). Claimant was instructed to perform an intense home exercise program of correct posture combined with hourly therapeutic exercises. Claimant would be treated daily for four to six weeks followed by a re-evaluation. (*Id.*).

Claimant began his daily work hardening physical therapy on August 17, 2010, and it lasted through October 21, 2010. (Tr. at 345-388). On August 17, 2010, Mr.

Murray noted that Claimant continued to suffer significant pain in the neck, right arm, low back, and right leg. (Tr. at 345). On August 19, 2010, Claimant reported his symptoms increased as activity increased. (Tr. at 348). The following day, Claimant walked one-half mile and carried ten pounds in one hand repeatedly throughout the morning. Mr. Murray noted that Claimant's sitting time and carrying endurance had increased. (Tr. at 349). Mr. Murray submitted an update to Dr. Ramesh on August 24, 2010, stating that Claimant was well-motivated and compliant. Even though Claimant had no decrease of the pain in his neck, back, arms, and legs, he did show improvement in his ability to endure sitting and walking. He was able to carry ten pounds repeatedly with no symptom increase. (Tr. at 398). On August 30, 2010, Claimant walked one and one half miles, carried ten pounds in one hand repeatedly, and advanced to lifting twenty-five pounds to waist. Mr. Murray observed that the increased weight caused a moderate increase to Claimant's back and leg symptoms. (Tr. at 352).

Claimant returned to Dr. Ramesh on August 24, 2010, reporting his neck and back pain had decreased from the first visit by thirty percent with medication and injections. On examination, Claimant's neck, upper extremities, and lumbar spine showed an increase in range of motion. Claimant's straight-leg raising was negative on the right side at sixty degrees and on the left side at sixty-five degrees while seated. In the supine position, the right side was negative at sixty-five degrees, and the left side was negative at seventy degrees. The right sacroiliac joint and bilateral lumbar facet joints were noted to be tender. (Tr. at 743-744). Dr. Ramesh excused Claimant from work until September 8, 2010, documenting that Claimant was attending a work hardening program as his employer had no modified work available. (Tr. at 744). Two days later, Dr. Ramesh performed right C4-C5, C5-C6, and C6-C7 cervical facet medial

branch block injections and right L3-L4, L4-L5, and L5-S1 lumbar facet joint injections. (Tr. at 708).

On August 31, 2010, Claimant reported to Mr. Murray that his pain level had dropped from 6-7 to 4 out of 10 and was slowly improving. (Tr. at 353). Claimant stated on September 2, 2010 that he felt an overall improvement of sixty percent. Mr. Murray evaluated Claimant's lifting ability by simulating lifting a vehicle hood between 78 and 106 pounds for three attempts. At 106 pounds, Claimant reported a moderate increase in back pain. (Tr. at 355). From September 3, 2010 through September 10, 2010, Claimant practiced lifting fifty pounds repeatedly, reporting that he felt stress in his back without pain. (Tr. at 356-60).

Claimant returned to Dr. Ramesh on September 8, 2010 reporting his neck and back pain had decreased since the first visit by sixty percent due to medications and injections. (Tr. at 741). An examination again showed increased range of motion of Claimant's neck and upper extremities. Examination of the spine revealed straight-leg raising was negative bilaterally at sixty degrees when seated, and bilaterally at sixty-five degrees in the supine position. Bilateral joint and lumbar facet joints were tender. (Tr. at 742.). Dr. Ramesh subsequently performed bilateral L3-L4, L4-L5, and L5-S1 lumbar facet medial branch block injections. Claimant reported the pain had been reduced and his range of motion had improved. (Tr. at 705-06). This procedure was repeated later in September with pain relief. (Tr. at 702-03).

On September 10, 2010, Mr. Murray documented that Claimant had seen gradual improvement and had increased his walking distance from 2 ½ miles to 3.1 miles. (Tr. at 360). From September 13, 2010 through September 24, 2010, Claimant's pain level remained at 4-5 out of 10. He showed increased endurance with lifting and in lumbar

range of motion. (Tr at 361-70). On September 24, 2010, Mr. Murray commented that a return to light duty work was available to Claimant. A possible job site visit was set for October 8, 2010. (Tr. at 370). On September 27, 2010, Mr. Murray felt Claimant had reached a plateau and believed he needed an epidural to assist with his leg pain. (Tr. at 371). Four days later, Mr. Murray noted Claimant was getting back to a more intense work-out now that his pain was reduced. (Tr. at 372). Although Claimant showed some improvement on September 29, 2010, (Tr. at 373), his pain was increased due to injections. (Tr. at 374). On October 7, 2010, Mr. Murray commented that he was concerned about Claimant being discharged to return to work when he was not ready. Mr. Murray opined that Claimant required neurosurgery and orthopedic consultations and consideration of epidural injections to address his constant leg pain. (Tr. at 378). On October 8, 2010, Mr. Murray stated that Claimant had minimal overall improvement of forty percent. (Tr. at 379).

On October 14, 2010, Mr. Murray submitted to Dr. Ramesh the results of a Level I functional capacity evaluation he performed on Claimant over the time period of October 11 through October 14, 2010. (Tr. at 334-340, 391-395). Mr. Murray opined that Claimant had generalized weakness in his trunk area with moderate range of motion deficits in the lumbar spine in extension. (Tr. at 334). A walking test showed that Claimant had a normal gait pattern with no assistive devices, and he could walk three miles as demonstrated in work hardening sessions. (Tr. at 338, 392). Claimant reported being able to sit a maximum of seventy minutes at a time and to stand approximately thirty minutes. (*Id.*). Based upon the evaluation, Mr. Murray concluded that Claimant was capable of a Light Medium Duty. Claimant could return to work in a transitional program, which included no overtime and driving no more than one hour at a time.

After an hour, Claimant would need to exit the vehicle and move about for five minutes before he resumed driving. He could lift up to thirty-five pounds infrequently and twenty-five pounds frequently. (Tr. at 335, 395). Mr. Murray recommended neurosurgery and orthopedic consultations, and suggested that Claimant return to work in a transitional duty program. In the meantime, Mr. Murray felt that Claimant should continue to participate in the work hardening program. (*Id.*). On October 20, 2010, Claimant complained of rib tenderness and leg pain. He appeared tired and on edge. (Tr. at 387). Claimant's gait was within functional limits as to stride length. Claimant was able to walk up to three miles exhibiting good endurance. He could sit for two hours, one hour at a time before changing positions, but could not stand for an extended period of time. Mr. Murray noted that Claimant "appeared to be going down the tubes before my eyes," with many medical complaints, although his back and neck were "as usual." Claimant was told to continue the home exercise program and to come to the work hardening program on a daily basis. (*Id.*).

Claimant presented to Dr. Stollings on September 28, 2010 for follow-up of uncontrolled hypertension. At this visit, he complained of muscle cramps. A physical examination revealed normal range of motion of the neck and all major muscle groups. Claimant had a normal gait and 5/5 muscle strength. (Tr. at 639-40). He returned on October 22, 2010 with a normal range of motion of the neck, normal gait, and normal range of motion in all major muscle groups. His muscle strength was 5/5, although he had some tenderness in the right lateral ribs. (Tr. at 636-37.).

In addition to injections, Dr. Ramesh examined Claimant on September 27, 2010, (Tr. at 739-41); October 14, 2010, (Tr. at 737-39); October 28, 2010, (Tr. at 735-37); November 15, 2010, (Tr. at 733-35); November 19, 2010, (Tr. at 731-33); and December

1, 2010. (Tr. at 729-30). On December 1, 2010, Claimant informed Dr. Ramesh that on November 16, 2010, he had returned to full duty at work with ten minute breaks every two hours; however, he was not able to last an entire work day. (Tr. at 729). Claimant reported that as long as he took pain medication, he could tolerate the pain, adding that his pain had decreased by twenty percent since his initial visit. (*Id.*). Both neck and lumbar range of motion remained unchanged from last visit. Straight-leg raising was negative bilaterally at fifty degrees, when seated, and bilaterally at fifty-five degrees in the supine position. (Tr. at 730). Dr. Ramesh advised Claimant to take over-the- counter Tylenol on an "as needed" basis with no more than three tablets per day. He also recommended that Claimant consult with a neurosurgeon. (Tr. at 730).

Claimant also presented to Boone Memorial Hospital on November 17, 2010 with complaints of numbness in his arms, neck pain that radiated downward, and pain in both hips and. (Tr. at 461). A CT scan of the cervical spine revealed no acute fracture or subluxation; however, there was degenerative disc disease seen at C5-C6 and C6-C7. (Tr. at 465). A CT scan of the lumbar spine revealed no acute fracture or subluxation, but did show a possible spinal stenosis at L4-L5 and possible disc herniation at L5-S1. (Tr. at 466).

On November 24, 2010, Claimant underwent a MRI of the cervical and lumbar spine at Saint Francis Hospital. MRI of the lumbar spine showed disc desiccation at the lower three level. (Tr. at 649). At L5-S1, there was a disc bulge with mild exit foraminal narrowing on the right and central canal stenosis. At the L4-L5 level, there was a right paracentral disc herniation with bilateral mild exit foraminal narrowing, moderate central canal stenosis, and ligamentous flavum hypertrophy. (*Id.*). At L3-L4, there was an asymmetrical disc bulge with a transverse rent and mild central and exit foraminal

narrowing. The radiologist opined that the dominant findings were at the L4-L5 level and should correlate with right lower extremity radiculopathy. (Tr. at 650). The cervical spine imaging showed straightening of the cervical spine with disc desiccation throughout. (*Id.*). At C4-C5, there was a left paracentral disc herniation that effaced the ventral and leftward cord and could correlate with left upper extremity radiculopathy. At C5-C6, there was a broad-based disc protrusion with mild effacement of the ventral cord and mild exit foraminal narrowing. (*Id.*). At the C6-C7 level, there was a right paracentral disc protrusion mildly effacing the left ventral cord, and at C3-C4, there was a noncompressive disc protrusion. The radiologist noted that Claimant's disc desiccation at C5 through C7 had worsened since his last imaging in May 2010. (Tr. at 651).

On December 9, 2010, Claimant presented to Frederick H. Armbrust, M.D., for a neurosurgical consultation arranged by Dr. Ramesh. (Tr. at 762-765). Dr. Armbrust reviewed the circumstances surrounding Claimant's work injury, noting that he had been off from work for an extended period of time, and when he recently tried to return, he had to leave after 4 hours due to increased pain. When asked about his current symptoms, Claimant reported a pain level of 10 on a 10-point scale, describing that pain as aching, throbbing, and dull. The pain was exacerbated by sitting, walking, any normal activity, and laying down, and could not be controlled. (Tr. at 765). As a result of the pain, Claimant could not sleep at night and was feeling anxious, nervous, and depressed. He took Hydochlorothiazide (Microzide) and Lyrica for his symptoms. (Tr. at 764).

A review of systems yielded the following positives: appetite loss, frequent headaches, blurred vision, feelings of imbalance, incontinence of stool, increased urinary frequency, loss of sensation, numbness, tingling, weakness, decreased range of motion, mood swings, and depression. (Tr. at 763-64) Physical examination

demonstrated a moderately limited range of motion in the neck in all directions with posterior cervical discomfort, but without evidence of a Lhemitte's or Spurling's type of phenomenon. Claimant's range of motion in the lumbar spine was significantly limited in all directions with accompanying lumbosacral junctional discomfort. Straight-leg raising and simultaneous hyper-knee flexion produced low back pain, but no radicular symptoms. (Tr. at 763). A neurological examination revealed excellent strength in all extremities with no atrophy and with normal muscle tone. Deep tendon reflexes were present throughout and measured at 2+. There was no pathologic reflex, Babinski, clonus, or Hoffman's, and Romberg was also negative. Claimant complained of a generalized decreased sensation in the entire right lower extremity. (*Id.*).

Dr. Armbrust reviewed the radiology studies including the recent MRI of the lumbar and cervical spine. He diagnosed Claimant with persistent cervical and low back pain with multiple abnormalities described in the MRI findings. Based upon the neurological examination, the lack of myelopathy, and lack of clear evidence of radiculopathy to correlate with the MRI studies, Dr. Armbrust opined Claimant was not a candidate for surgical intervention. (Tr. at 762-763). He deferred to Dr. Ramesh as to whether Claimant would benefit from a referral to a pain clinic. One month later, Claimant presented to Southridge Urgent Care requesting a referral to a pain clinic with a history of herniated discs. After Dr. David Life, the health care provider, confirmed that Claimant had been examined by Dr. Armbrust, who advised against surgery, he referred Claimant to Dr. Deer's pain clinic. (Tr. at 937).

Claimant presented to the CAMC Teays Valley Hospital Pain Relief Center, where he began treatment with Matthew Ranson, M.D., on February 4, 2011. (Tr. at 974-82). Claimant was using a cane for ambulation and reported having headaches, dizziness,

blurred vision, anxiety, arthralgias and urinary frequency, urgency, nocturia, and incontinence. (Tr. at 981). In a letter to Dr. Life, Dr. Ranson relayed that Claimant complained of pain in his cervical and lumbar spine, describing it as burning, aching, tender, and stabbing. He also had tingling, spasms, and throbbing that radiated into his right upper and right lower extremities. Claimant stated that the pain was constant and had remained unchanged in intensity since onset. (Tr. at 990). According to Claimant, the combination of Flexeril, Voltaren, and hydrocodone provided some pain relief. (*Id.*). A physical examination of the cervical spine showed diminished flexion to approximately forty degrees and extension only to minus twenty degrees. Right and left rotation elicited significant tenderness. The upper extremities, however, showed a full range of motion. Grip strength was equal and symmetrical at 5/5 bilaterally. Motor strength in the lower extremities was good; equal and symmetrical at 5/5 bilaterally. Claimant had positive straight-leg raising on the right side at thirty degrees when seated. (Tr. at 991). Range of motion of the lumbar spine showed diminished flexion to approximately sixty degrees with extension limited to negative twenty degrees. Claimant had significant tenderness throughout the upper thoracic and lower lumbar spine. Claimant was able to toe walk with no difficulty, but his gait was mildly antalgic. (*Id.*). Examination of Claimant's lower extremities showed 2+ radial and 1+ dorsalis pedis pulses bilaterally, with no evidence of edema, cyanosis, or varicosities. (Tr. at 991-992).

Dr. Ranson diagnosed Claimant with cervical and lumbar sprain/strain. He suggested that Claimant consider C6-C7 and lumbar epidural steroid injections with the possibility of undergoing a minimally invasive laminectomy decompression if conservative treatment did not improve the situation. (Tr. at 992). Dr. Ranson also recommended EMG and nerve conduction studies and provided Claimant with a

titration to Lyrica. (*Id.*).

Claimant returned to Dr. Ranson on March 21, 2011 for the EMG and nerve conduction studies of the upper and lower extremities bilaterally. (Tr. at 1017-20).The tests were interpreted by Richard Bowman, M.D., who found the results to be within the normal range, and without evidence of cervical or lumbar radiculopathy, generalized neuropathic or myopathic processes, or focal entrapment neuropathy. (*Id.*). Dr. Ranson documented the study results. (Tr. at 1049). A review of systems was negative except for pain in the neck, upper extremities, low back, and lower extremities. After performing an examination, Dr. Ranson diagnosed Claimant with cervical sprain/strain and cervical radiculopathy. He opined that Claimant did have evidence of radiculitis without any significant myelopathy or radiculopathy. Dr. Ranson recommended that Claimant undergo a trial of two separate intralaminar cervical C6-C7 epidural steroid injections. If the injections did not reduce Claimant' pain, then Dr. Ranson would consider obtaining a second surgical opinion from Matthew Werthammer, M.D. (Tr. at 1049-50).

Dr. Ranson met with Claimant on April 11, 2011, to discuss treatment for his cervical neck pain. Claimant was supposed to receive injections, but Worker's Compensation had not yet authorized the medications. Claimant complained of continued neck pain. Lyrica did not seem to be working, although Claimant denied any new focal neurologic deficits. (Tr. at 1043-44). Dr. Ranson documented that he would perform the injections through Claimant's primary health insurance carrier if the injections were not approved by Workers' Compensation. Dr. Ranson would also consider sending Claimant to Dr. Werthammer for a surgical evaluation. In the meantime, Dr. Ranson advised Claimant that he should not to return to work until he received appropriate treatment for his cervical radiculopathy. (Tr. at 1046). Dr. Ranson

subsequently performed a C6-C7 intralaminar cervical epidural steroid injection with fluoroscopic guidance on April 11, 2011. (Tr. at 1008-1009). On April 21, 2011, Dr. Ranson performed a C5-C6 intralaminar cervical epidural injection with fluoroscopic guidance. (Tr. at 1002-1003). Claimant tolerated the procedures well.

Claimant reported to Dr. Stollings on April 12, 2011 to follow-up his hypertension. A review of systems was positive for neck and back pain. Dr. Stollings noted that Claimant had undergone injections, but did not obtain much relief from them. (Tr. at 1121). Cervical range of motion was full. (Tr. at 1122). Claimant's blood pressure was high, so Dr. Stollings refilled his medication and asked Claimant to return in two weeks for a blood pressure re-check. (Tr. at 1123). Claimant returned as instructed on April 26, 2011. (Tr. at 1124). His blood pressure was better, but he still had neck pain. Dr. Stollings refilled Claimant's other medications. (Tr. at 1126).

On May 2, 2011, Claimant returned to Dr. Ranson's office for primary complaints of upper extremity pain and numbness. Dr. Ranson felt that Claimant had radiculitis without significant myelopathy or radiculopathy. He recommended intralaminar cervical C6-C7 epidural steroid injections and a cortisol level. (Tr. at 1066). If Claimant could not undergo these or did not obtain significant relief, Dr. Ranson would send him to get a second surgical opinion.

On May 20, 2011, Dr. Ranson noted that Claimant had undergone intralaminar C6-C7 steroid injections with approximately forty percent relief of symptoms for four days after. Claimant now reported that his pain had returned to baseline level with continued complaints of neck and upper extremity radicular symptoms in addition to low back and low extremity pain. Dr. Ranson decided to pursue a second surgical opinion, as Claimant had failed conservative treatment and physical therapy. (Tr. at

1056-57).

On July 11, 2011, Matthew Werthammer, M.D., sent Dr. Ranson a letter detailing the results of his neurosurgical consultation with Claimant earlier that day. (Tr. at 1082-84). Dr. Werthammer documented the history of Claimant's injury and ensuing symptoms and also took an extensive medical, family, social, surgical, and medication history from him. (Tr. at 1082). Dr. Werthammer performed a general physical examination, and then did a more focused neurological examination. (Tr. at 1083). He documented that Claimant had significant paraspinal muscle tenderness, as well as limited lumbar and cervical ranges of motion. (Tr. at 1083). Claimant also showed diminished sensation to light touch throughout the right leg, but his deep tendon reflexes were normal at 2+/4 throughout the upper and lower extremities bilaterally. Claimant's gait was antalgic, and his straight-leg raising test was positive on the right side. (*Id.*). Dr. Werthammer scanned the MRI imaging, noting a number of abnormalities. He opined that Claimant exhibited lumbar and cervical disc disease with some of the symptoms consistent with cervical and lumbar radiculopathy, but lacking evidence of myelopathy. Dr. Werthammer remarked that although Claimant had a history of fibromyalgia and diffuse pain, many of his symptoms correlated with radicular type symptoms. (*Id.*). Dr. Werthammer proposed a right sided L4-L5 lumbar microdiskectomy to address Claimant's lumbar symptoms. (Tr. at 1084). After explaining the risks and limitations of the procedure, Claimant decided to proceed with surgery. Accordingly, Dr. Werthammer sought authorization from Workers' Compensation to proceed. (*Id.*).

On September 1, 2011, Claimant presented to Boone Memorial Hospital with complaints of low back pain. Claimant reported the onset began over a year prior noting

the pain had increased and was radiating down the right leg into the right toes causing numbness in his foot. (Tr. at 1100). Claimant was given prescriptions for Vicodin, Valium, and Medrol. (Tr. at 1102). His diagnosis was acute exacerbation of low back pain.

On September 16, 2011, Claimant was seen by Dr. Ranson at Teays Valley Hospital's Pain Relief Clinic for complaints that his "back went out." He described the back pain as a throbbing, burning sensation. (Tr. at 1095). Dr. Ranson noted that Claimant had seen Dr. Werthammer and was waiting for authorization to have disc surgery. Dr. Ranson told Claimant to remain off work until after he had surgery. He gave Claimant a temporary prescription for Flexeril 10 mg to be taken twice a day. Dr. Ranson indicated he would consider a prescription for Ultram in the future. (Tr. at 1094).

Claimant was seen in follow-up at the Teays Valley Hospital's Pain Clinic on February 13, 2012. Claimant reported he did not want to take Flexeril because it made him irritable. (Tr. at 1178). He also stated that he was still awaiting authorization from Workers' Compensation for surgery. Dr. Ranson changed Claimant's medication to Skelaxin and increased his dosage of Lyrica. (Tr. at 1176). He told Claimant to remain off work until after the surgery. (Tr. at 1177).

On April 16, 2012, Claimant presented to Boone Memorial Hospital's Emergency Department with complaints of chronic back pain radiating down his legs as well as his right arm that had increased in intensity the day prior after he got up from the sofa and walked across the room. (Tr. at 1096-98). Upon examination, Claimant had pain on bilateral straight leg raises, as well as on hip flexion and rotation. His spinous process was not tender; however, there was paraspinous tenderness on both the right and left

sides. His knee jerk and ankle jerk reflexes were hypoactive. Claimant was given intramuscular injections of Depomedrol and Toradol while in the ED. He was discharged in stable condition about an hour later with written prescriptions for a Medrol dose pak; Lortab; and Naprosyn. (*Id.*).

Claimant returned to the Teays Valley Hospital's Pain Relief Clinic on May 4, 2012 in follow-up of his ED visit. He reported an increase in pain and expressed difficulty with ambulation. He indicated that he was still waiting on authorization for surgery. (Tr. at 1174).  Claimant stated that Lyrica was helping his symptoms, but he was unable to refill the prescription due to cost. (Tr. at 1174-75). Dr. Ranson documented that Claimant would need help through Pfizer to afford Lyrica. He recommended a follow-up with Dr. Werthammer. (Tr. at 1175).

### B.  Evaluations and Opinions

As part of his Worker's Compensation claim, Claimant's employer scheduled him for an independent medical examination (IME) by Prasadarao B. Mukkamala, M.D. on November 11, 2010. (Tr. at 905-16). Claimant's chief complaints were pain in the neck and low back with numbness to both lower extremities. (Tr. at 906, 908). He described his treatment history as including an initial visit to the Emergency Department followed by regular appointments with Dr. Ramesh, physical therapy three times a week for a three-month period, and four sets of injections, which Claimant did not feel were helpful. Claimant stated that his hands had recently begun to jerk, and he attributed this new symptom to his neck injections. Claimant also reported completing a four-week work hardening program. (Tr. at 906). He told Dr. Mukkamala that he had control of his bladder and bowel, but did have some hesitancy of urination. (Tr. at 907). Claimant was asked about his current medications, and he listed Klor-Con, Diltiazem, Lyrica,

Loratadine, Flexeril, Diclofenac Sodium, and Norco. (Tr. at 907). With respect to his history of injuries, Claimant related having back problems fifteen years earlier that were not caused by an injury and which improved with medications prescribed by Dr. Stollings. His back problems had returned approximately four years earlier, and Claimant received one set of injections, which he felt gave him about six months of relief. (Tr. at 907-08). When asked about his functional capacity, Claimant stated that he was capable of carrying out activities of daily living, albeit at a slow pace, but did not perform household chores. He also reported that he was unable to return to work, although Dr. Mukkamala noted that a functional capacity evaluation found Claimant to be capable of completing tasks at the light/medium physical demand level. (Tr. at 908). Dr. Mukkamala conducted a review of records from Charleston Area Medical Center's radiology department, Dr. Ramesh's office, various MRI studies, physical therapy and work hardening, and the functional capacity evaluation performed by Mr. Murray at Charleston Physical Therapy Specialists. (Tr. at 908-12).

Dr. Mukkamala completed a physical examination of Claimant. He found that Claimant's cervical spine range of motion measurements were consistent on repeated examinations; there were no paracervical muscle spasms, although there was right paracervical muscle tenderness; Claimant's  upper extremities showed normal range of motion in all joints; and his motor and deep tendon reflexes were hypoactive. (Tr. at 912-13). A sensory examination indicated diminished sensation in Claimant's right upper extremity with a global and non-anatomical pattern, and his grip strength measured ninety pounds on the right side and one hundred twenty pounds on the left. (Tr. at 912-913). Dr. Mukkamala's examination of the lower extremities revealed normal range of motion in all joints, although the SI joint maneuvers elicited pain on the right

31

side. Claimant's motor and pedal pulses were normal, but his deep tendon reflexes were hypoactive. A sensory examination showed diminished sensation in the right lower extremity with a global and non-anatomical pattern. A straight-leg raising test in the seated position measured ninety degrees on both sides with no complaints of pain, while in the supine position, Claimant's straight-leg raising test measured forty degrees on both sides with Claimant reporting pain. (Tr. at 912-913). Dr. Mukkamala examined Claimant's back and found no scoliosis, no paraspinal muscle spasm or tenderness, and no vertebral or SI joint tenderness. Dr. Mukkamala noted that Claimant was able to ambulate independently, but walked with a slight limp on the right side. Claimant appeared hesitant to walk on his heels and toes and was unable to squat. (Tr. at 913). Based upon the examination and record review, Dr. Mukkamala diagnosed Claimant with cervical sprain, which was related to the work injury. (Tr. at 915). Claimant also had back pain, but Dr. Mukkamala felt that this pain pre-existed the injury. He opined that Claimant did not require further treatment, but should continue his home exercise program. As far as returning to work, Dr. Mukkamala felt that Claimant was able to return to full-time light/medium work, despite Claimant's belief that he could not tolerate the work. Dr. Mukkamala pointed out that Mr. Murray's functional capacity evaluation established Claimant's ability to perform light exertional work at a minimum. (*Id.*). For purposes of Worker's Compensation, Dr. Mukkamala opined that Claimant had a ten percent whole person impairment related to his back and neck, with eight percent attributable to the work injury. (Tr. at 916). Ultimately, workers' compensation awarded Claimant a partial permanent disability rating of fifteen percent. (Tr. at 1203).

Dr. Mukkamala completed a RFC form on the same date. He opined that Claimant could sit a total of eight hours with breaks, and could stand, walk, and drive

four hours each in an eight-hour workday. Claimant could frequently lift up to twenty pounds, could occasionally lift twenty to fifty pounds, but he should never lift more than fifty pounds. (Tr. at 920). Claimant was able to continuously carry up to ten pounds, frequently carry up to twenty pounds, occasionally carry twenty to fifty pounds, but could never carry more than fifty pounds. (*Id.*). Dr. Mukkamala felt Claimant was capable of continuously grasping and manipulating objects; frequently reaching above the shoulder to grasp objects; occasionally pushing, pulling, and bending; but should never climb/balance, stoop/squat, or kneel/bend. (Tr. at 921). Environmentally, Claimant had no restrictions to dust, fumes, or gases. He was mildly restricted in his ability to work around moving machinery and to tolerate temperature change, and was moderate restriction to unprotected heights. Claimant was able to use hands and feet in repetitive movements. (*Id.*). On December 7, 2010, Dr. Mukkamala submitted an addendum report confirming his opinion that Claimant had reached maximum medical improvement. Dr. Mukkamala noted one of the qualifications of a rock truck driver was the ability to handle up to forty pounds. Dr. Mukkamala opined that Claimant should be able to return to work with a material handling restriction of nothing over thirty five pounds. (Tr. at 924-925).

On March 23, 2011, non-examining agency consultant, Carl Bancoff, M.D., completed a Physical Residual Functional Capacity Assessment form. (Tr. at 945-952). As to exertional limits, Dr. Bancoff determined that Claimant could occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand and/or walk at least two hours in an eight-hour work day; sit about six hours in an eight-hour work day, with unlimited restrictions as to pushing and pulling, including the operation of hand and/or foot controls. Dr. Bancoff acknowledged that Claimant had marked loss of motion in the

neck and spine; however, there was no evidence of myelopathy, radiculopathy, gait abnormality, or use of assistive device. (Tr. at 946). With regard to postural limitations, Dr. Bancoff found Claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but he could never climb ladders, ropes, or scaffolds. (Tr. at 947). Claimant had no manipulative, visual, or communicative limitations. (Tr. at 948-949). As to environmental limitations, Claimant could tolerate unlimited exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, or poor ventilation. However, Claimant should avoid extreme cold and heat and hazards such as machinery and heights. (Tr. at 949). Dr. Bancoff felt Claimant was only partially credible in describing the severity of his impairments, because his subjective symptoms did not correlate with the objective data. (Tr. at 950).

On May 10, 2011, Kumar Swami, M.D., completed a Case Analysis. (Tr. at 970). He noted that Claimant alleged disability due to back and neck pain, numbness and tingling in the legs and arms, and fibromyalgia. Dr. Swami reviewed the medical evidence of record. He indicated that after the April, 2010 work-related injury, Claimant was evaluated by several physicians, and his physical examinations were normal for the most part with only occasional findings of 4-5/5 lower limb strength. However, Claimant's coordination, gait, and other functions appeared normal. (Tr. at 970). Dr. Swami referred to a report by Dr. Ramesh regarding the recent functional capacity examination completed by Mr. Murray, which recommended restricting Claimant to lifting no more than thirty-five pounds. According to Dr. Ramesh, Claimant was capable of returning to work with only that lifting limitation.  Dr. Swami mentioned that the RFC completed by Dr. Bancoff in March, 2011 did not mention this medical source statement, so Dr. Swami referenced where in the record it was located. (*Id.*). On that

34

same date, Dr. Swami completed a medical consultant review of Dr. Bancoff's RFC form in which he disagreed with the exertional limitations found by Dr. Bancoff. (Tr. at 972-73). Dr. Swami felt that Claimant was capable of heavier lifting and carrying and could stand and/or walk for six hours in an eight-hour work day, rather than the two hours suggested by Dr. Bancoff. Dr. Swami explained that Dr. Bancoff's estimates on these capacities were flawed because he had not considered the medical source statement of Dr. Ramesh. (Tr. at 972). Other than these two areas, Dr. Swami agreed with the remaining limitations found by Dr. Bancoff. (*Id.*).

On June 9, 2011, Dr. Ranson completed a Medical Source Statement of Ability to do Work Related Activities (Physical). (Tr. at 1073-77). He opined that Claimant was capable of frequently lifting and carrying ten pounds; could stand and/or walk at least two hours in an eight-hour work day; and needed to periodically alternate sitting and standing to relieve pain and discomfort. Dr. Ranson indicated that Claimant's ability to push and pull was also limited, but he failed to explain to what degree and in what manner. (Tr. at 1074). Dr. Ranson based his opinions on "MRI findings and physical exam." (Tr. at 1074). With respect to postural limitations, Dr. Ranson felt that Claimant could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; could occasionally balance, kneel, crouch, and stoop; but could never crawl. Dr. Ranson did not elaborate on the medical and/or clinical findings that supported these opinions. (*Id.*). In addition, Dr. Ranson opined that Claimant had no limitations related to temperature extremes, noise, dust, fumes, odors, chemicals, or gases, but he should have only limited exposure to humidity, wetness, vibrations, and hazards, such as machinery or heights. (Tr. at 1075). As to manipulative limitations, Dr. Ranson stated that Claimant was limited to only occasionally reaching in all directions, including overhead. He found that Claimant

had no visual or communicative limitations. (Tr. at 1076). Once again, Dr. Ranson did not supply any details regarding the medical and clinical findings that supported these additional opinions.

On June 28, 2011, non-examining agency consultant, Marcel Lambrechts, M.D., completed a case analysis noting Claimant had received a diagnosis of fibromyalgia, and neck and back pain. Dr. Lambrechts observed that Claimant had not improved on medication and was given a TESI at C5-C6; however, there were no further reports of improvement after that. Therefore, based on the available record, Dr. Lambrechts agreed with the evaluation completed by Dr. Swami. (Tr. at 1080).

## VI.   Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence

exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   <u>Discussion</u>

As previously stated, Claimant argues that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in three ways: (1) he failed to find that Claimant met the severity criteria of Listings 1.02 and 1.04; (2) he failed to comply with the treating source rule by giving controlling weight to Dr. Ranson's opinions, and by failing to provide a good explanation for why he gave the opinions less than controlling weight; and (3) he failed to pose hypothetical questions to the vocational expert that accurately reflected all of Claimant's impairments. Each challenge will be addressed in turn.

### A.  *Listing 1.02 and Listing 1.o4*

A claimant should be found disabled at step three of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments are set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Because the listed impairments presume disability, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production

and proof at this step of the disability determination process. *Grant v. Schweiker,* 699
F.2d 189, 191 (4th Cir. 1983).

Listings 1.02 and 1.04 are contained in Section 1.00 of the Listing, which deals
with disorders of the musculoskeletal system. *See* 20 C.F.R., Part 404, Subpart P,
Appendix 1, §1.00. Listing 1.02 covers major dysfunction of a joint, "characterized by
gross anatomical deformity ... chronic joint pain and stiffness with signs of limitation of
motion or other abnormal motion of the affected joint and findings on medically
acceptable imaging of joint space narrowing, bony destruction, or ankyloses of the
affected joint." *Id.* at § 1.02. In addition to these basic characteristics, severity criteria
are met with:

> A.   Involvement of one major peripheral weight-bearing joint (i.e. hip,
> knee, ankle), resulting in inability to ambulate effectively, as defined in
> 100B2b; or
>
> B.   Involvement of one major peripheral joint in each upper extremity (i.e.
> shoulder, elbow, wrist-hand), resulting in inability to perform fine and
> gross movements effectively as defined in 100B2c.

*Id.* Here, the ALJ compared Claimant's chondromalacia to Listing 1.02, but found that it
did not meet or equal the listing because there was no evidence of gross anatomical
deformity, or an inability to ambulate effectively. (Tr. at 19). Claimant contends that the
ALJ is incorrect in his conclusion, because Claimant has MRI findings showing
chondromalacia patella and a partially torn anterior cruciate ligament, and Claimant has
difficulty ambulating effectively in that he requires the use of a cane to walk. (ECF No.
14 at 13).

At the outset of Section 1.00, the regulations explain what is meant by "the
inability to ambulate effectively." *Id.* at § 1.00B2b. Specifically, this phrase is defined as
"an extreme limitation of the ability to walk ... having insufficient lower extremity

functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits functioning of both upper extremities." *Id.* at § 1.00B2b(1). Examples include "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id.* at § 1.00B2b(1). As the Commissioner points out in her brief, while Claimant occasionally uses one cane to help him walk, there is no evidence in the record that he uses an assistive device that limits the functioning of *both upper extremities,* nor is there evidence that he is unable to carry out routine activities, walk on rough or uneven surfaces, climb a few steps with a single handrail, or use public transportation. Indeed, Claimant drove himself to the administrative hearing and testified that he negotiates 25 steps to his second floor apartment on a daily basis, using at most a single cane. He also manages to take his young daughter to the park, to school, and to movies. (Tr. at 45, 47-48, 58, 60). Consequently, Claimant is able to ambulate effectively. As such, the ALJ correctly found that Claimant did not meet the relevant severity criteria of Listing 1.02A.[1]

The ALJ also compared Claimant's back impairment with the criteria of Listing 1.04, but determined that Claimant did not meet that listed impairment "because the evidence does not indicate compromise of a nerve root in the spine with the inability to ambulate or manipulate effectively." (Tr. at 19). Listing 1.04 involves disorders of the spine; such as, herniated discs, spinal stenosis, degenerative disc disease, and facet

---

[1] Claimant does not contend that he meets the criteria in Listing 1.02B.

arthritis, which result in compromise of a nerve root or the spinal cord. In addition to these descriptive characteristics, the disorder must also have:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight–leg raising test (sitting and supine); or

> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an ability to ambulate effectively, as defined in 1.00B2b.

*Id.* at 1.04. Claimant alleges that he meets § 1.04A because he has MRI findings showing herniated discs, foraminal narrowing, and central canal stenosis. According to Claimant, these findings indicate the presence of nerve root compression. In addition, he has radicular pain, range of motion limitations, and at least two positive straight-leg raising tests; thus, establishing that he meets § 1.04A. (ECF No. 14 at 12). The Commissioner responds that Claimant is required to prove the existence of **all** of the severity criteria of § 1.04A in order to meet the Listing, and Claimant has no evidence of motor loss, sensory loss, or reflex loss. Moreover, Claimant's straight-leg raising tests were negative in both the sitting and supine positions on at least two occasions. (ECF No. 15 at 14).

To examine the validity of the ALJ's conclusion that the record does not demonstrate listing level nerve root or spinal cord compromise, the Court must review the medical evidence relied upon by the ALJ, as detailed at step two of the written decision. The ALJ started by discussing Claimant's medical imaging and testing, noting that spinal x-rays taken after his injury in April 2010 were normal, and CT scans

performed at the same time showed no evidence of acute injury. (Tr. at 16). An MRI completed in May 2010 revealed degenerative changes, some disc protrusions, and left-sided canal stenosis encroaching on the spinal cord. However, EMG and nerve conduction studies of the lower extremities were interpreted as normal in July 2010. (*Id.*). After Claimant received physical therapy, injections, and medications, he reported a sixty percent decrease in symptoms by October 2010. Claimant also participated in a work-hardening program that ran eight hours per day for two weeks. On October 22, 2010, Dr. John Snyder at Madison Medical PLLC performed a physical examination of Claimant that revealed he had a normal gait, normal range of motion in all muscle groups, and 5/5 muscle strength. (Tr. at 16, 637). On November 11, 2010, Dr. Mukkamala examined Claimant and found normal straight-leg raising bilaterally, when seated, and normal motor testing. Claimant had a slight limp on his right side, but was able to walk independently. (Tr. at 16, 913). Claimant had diminished sensation on the right side, but his range of motion testing was normal in all extremities.

In November 2010, Claimant had additional medical imaging performed. His MRI findings on November 24, 2010 showed disc herniation and protrusion in the cervical spine, disc protrusion in the lumbar spine, moderate central canal stenosis in the lumbar spine, central and exit foraminal narrowing in the cervical and lumbar spine, and effacement of the cervical disc herniation on the ventral and leftward cord. (Tr. at 649-51). Claimant was sent to Dr. Armbrust, a neurosurgeon, for evaluation. (Tr. at 17). After examining Claimant and reviewing his films, Dr. Armbrust commented that there was no evidence of myelopathy, or a clear radiculopathy that correlated with the MRI studies. (Tr. at 17, 929). Dr. Armbrust also found Claimant to have excellent strength, normal muscle tone, normal deep tendon reflexes, and no atrophy. (*Id.*).

The ALJ reviewed the records supplied by Dr. Ranson, Claimant's pain management physician, commenting that in February 2011, Claimant had a decreased cervical spine range of motion and a positive straight-leg raising test on the right side while seated. However, his left side was negative, and Claimant was not tested in the supine position.  (Tr. at 17, 994). Claimant's strength and sensation were equal and normal in the lower extremities, and he could toe walk without difficulty. Dr. Ranson ordered EMG and nerve conduction studies of all extremities, which were interpreted as normal on March 14, 2011. (Tr. at 17, 1019). Dr. Ransom documented that Claimant was doing well on Lyrica.

An evaluation by Dr. Werthammer, a neurosurgeon, performed on July 11, 2011 corroborated the prior evaluations in that there was no evidence of myelopathy, and Claimant had normal deep tendon reflexes, muscle bulk, and tone. Dr. Werthammer's findings varied from Dr. Ranson's February findings somewhat in that Claimant had diminished sensation and slightly decreased motor strength in the right leg (4/5). (Tr. at 17, 1083). Claimant still showed a positive straight-leg raising on the right side, although Dr. Werthammer did not indicate what position Claimant was in at the time the positive result was returned, nor did he document whether he performed the test in both the seated and supine positions. Dr. Werthammer felt that Claimant had "radicular-type" symptoms, although he also had a history of diffuse pain and fibromyalgia. (*Id.*).

In light of this medical evidence, the ALJ did not err in finding that Claimant failed to meet Listing 1.04A. As the Commissioner correctly argues, the records do not substantiate that Claimant has motor loss in his extremities, with accompanying sensory or reflex loss. With the exception of one finding of slightly diminished muscle strength in the right lower extremity, numerous examinations of Claimant's back and legs

reflected normal muscle tone and strength, with no atrophy. Moreover, while Claimant had a few positive straight-leg raising tests, none of the tests were positive in both the seated and supine positions, as required by Listing 1.04A. *See Harris v. Colvin,* Civil Action No. 3:14cv90, 2015 WL 1259403, at *15 (E.D.Va. Mar. 18, 2015); *Page v. Astrue,* No. 1:12-cv-3367-WSD, 2014 WL 988825, at *12 (N.D.Ga. Mar. 12, 2014); *Nieves v. Astrue,* No. EP-12-CV-069-RFC, 2013 WL 1192013, at * 7 (W.D.Tex. Mar. 21, 2013). The introductory paragraph to Section 1.00 explains, "[a]lternative testing methods should be used to verify the abnormal findings; e.g. a seated straight-leg raising test in addition to a supine straight-leg raising test. Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation." 20 C.F.R., Part 404, Subpart P, Appendix 1, §1.00D. Lastly, while the disc herniation and protrusion, central canal stenosis, and foraminal narrowing seen on MRI may all cause nerve root compression, these conditions may also be present without any accompanying symptoms.[2] Accordingly, Claimant's MRI findings, alone, do not establish nerve root compression of sufficient

---

[2] Disc herniation may initially cause pain and sciatica, but with conservative treatment, the symptoms usually lessen with time, and may even disappear. *See* Herniated Disk, available at www.nlm.nih.gov./medlineplus.ency/article/000422.htm, last updated April 24, 2015. A.D.A.M., Inc., Medline Plus Medical Encyclopedia, U.S. National Library of Medicine, National Institutes of Health, Bethesda, MD. Similarly, spinal stenosis may be present without accompanying symptoms:

> Spinal stenosis is a narrowing of spaces in the spine (backbone) that results in pressure on the spinal cord and/or nerve roots. This disorder usually involves the narrowing of one or more of three areas of the spine: (1) the canal in the center of the column of bones (vertebral or spinal column) through which the spinal cord and nerve roots run, (2) the canals at the base or roots of nerves branching out from the spinal cord, or (3) the openings between vertebrae (bones of the spine) through which nerves leave the spine and go to other parts of the body.... ***The space within the spinal canal may narrow without producing any symptoms***. However, if narrowing places pressure on the spinal cord, cauda equina, or nerve roots, there may be a slow onset and progression of symptoms.

*See* NIH Publication No. 09–5327 (emphasis added). National Institute of Arthritis and Musculoskeletal and Skin Diseases (NIAMS), National Institutes of Health,  Bethesda, MD

severity to meet Listing 1.04A.

The Commissioner also asserts that Claimant does not meet Listing 1.04A because he walks without significant difficulty and without using assistive devices that limit the functioning of both upper extremities. (ECF No. 15 at 14-15). Indeed, the ALJ explicitly found that Claimant's ability to ambulate effectively precluded a finding that he met either of the relevant musculoskeletal listings. Courts disagree on whether the inability to ambulate effectively is a criterion of Listing 1.04A. *Compare Leibig v. Barnhart,* 243 F.App'x. 699, 702, 2007 WL 1748374 (3rd Cir 2007) (Section 1.04A "requires an inability to ambulate effectively or an inability to perform fine and gross movements effectively."), *and DeCoito v. Astrue,* No. 1:07–cv–0330–SEB–TAB, 2008 WL 906164, at *3 (S.D.Ind. Mar.31, 2008) (Listing 1.04A "requires, in part, a finding that the claimant has an inability to ambulate effectively."), *with Laplume v. Astrue,* No. 08–cv–476–PB, 2009 WL 2242680, *5 (D.N.H. July 24, 2009) ("Laplume correctly notes that the inability to ambulate effectively is not a requirement of section 1.04A."), *Jarrette v. Colvin,* No. 10C5778, 2014 WL 1560331, at *12 (N.D.Ill. Apr. 18, 2014) (holding that "[w]hile a claimant's ability to 'ambulate effectively' is a relevant issue for listing 1.04 'C'—and is defined by listing 1.00B(2)(b)—effective ambulation has no bearing on whether a claimant satisfies listing 1.04 'A.'"), *and Taylor v. Colvin,* No. 12–CV–412–FHM, 2013 WL 4544262, at *2 n.3 (N.D.Okla. Aug. 27, 2013) ("The court rejects the Commissioner's assertion that Plaintiff was required to demonstrate an inability to ambulate effectively to meet Listing § 1.04A. The Commissioner's reliance on the requirements of § 1.00(2)(a) is misplaced. That section defines the term 'functional loss' as it is used in the musculoskeletal listings. Section 1.04A does not employ the term "functional loss' but instead specifically defines the limitations that will meet the criteria

for that listing."). In this circuit, several courts have found ineffective ambulation to be a component of § 1.04A, while others have not. *Compare Vest v. Astrue,* No. 5:11CV047, 2012 WL 4503180, at *4 (W.D.Va. Sept. 28, 2012) ("Thus, Vest is required to prove that he is unable to ambulate effectively ... in order to meet or medically equal Listing 1.04."), *Moss v. Astrue,* No. 2:11–cv–44, 2011 WL 7768883, at *9 (N.D.W.Va. Dec. 30, 2011) (ability to ambulate effectively is a consideration for Listing Section 1.04A), *McKoy v. Astrue,* No. 4:08–2329, 2009 WL 2782457, at *16 (D.S.C. Aug. 28, 2009) ("Plaintiff is mistaken that there is no requirement that the claimant prove his inability to ambulate effectively in order to meet the criteria of the severe musculoskeletal system impairments contained in Listings 1.00–1.08."), *and Gaines v. Astrue*, No. 9:08–562–HMH–BM. 2009 WL 1331103, *2 (D.S.C. May 12, 2009) (holding that Listing 1.04A requires a finding that the claimant has an inability to ambulate effectively), *with Roybal v. Astrue,* No. 1:11CV389, 2014 WL 2574509, at *1 (M.D.N.C. June 9, 2014) ("[T]he ability to ambulate effectively is not responsive to the question whether a claimant meets Listing 1.04A; rather, it is required by Listing 1.04C."), *and Wetmore v. Astrue,* Civil Action No. 5:09CV38 2010 WL 1901792, *3 (N.D.W.Va. May 11, 2010) (holding that whether the plaintiff can ambulate effectively is "a factor that this Court, as well as both the plaintiff and the defendant, agree is not included in the § 1.04A analysis.").

In this case, it is not necessary to resolve that disagreement as Claimant's ability to ambulate effectively is not critical to the step three determination given that he has not met other unambiguous severity criteria of Listing 1.04A. Therefore, the undersigned **FINDS** that the ALJ did not err at step three of the sequential process by finding that Claimant did not meet Listings 1.02 and 1.04.

### B.  Weighing Medical Source Opinions

Claimant's next challenge is to the weight the ALJ gave to the opinions of Dr. Ranson, Claimant's treating physician at the Teays Valley Pain Relief Clinic. Specifically, Claimant contends that Dr. Ranson's opinions were entitled to controlling weight under Social Security regulations and rulings unless the opinions were unsupported or were contrary to other substantial evidence of record. If the opinions were given less than controlling weight, the ALJ was required to provide an explanation supported by references to the evidence that justified the reduced weight. Claimant's argues that notwithstanding these requirements, the ALJ discounted Dr. Ranson's opinions without providing references to the specific evidence that undermined or contradicted Dr. Ranson's opinions. Thus, the ALJ violated the "treating source rule" by summarily rejecting Dr. Ranson's Medical Source Statement of Ability to do Work-Related Activities without providing a clear and cogent explanation for doing so.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. *Id.* § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight

to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(1)-(2). Nevertheless, a treating physician's opinion on the nature and severity of an impairment is afforded ***controlling*** weight only if two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be

rejected in whole or in part. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* § 404.1527(c)(4). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

In the written decision, the ALJ assigned weight to most of the medical source opinions evaluating Claimant's functional capacity, including those expressed by Dr. Ranson in the June 2011 Medical Source Statement of Ability to do Work-Related Activities form. (Tr. at 22-23). The ALJ stated the following regarding Dr. Ranson's assessment:

> The medical evidence of record does not support the level of limitation found by Dr. Ranson. Therefore, I give little weight to the opinion as inconsistent with other evidence of record. I have considered and evaluated all the evidence of record, including the hearing testimony.

(Tr. at 23). Clearly, these three lines are inadequate to provide good reasons for the decision not to give controlling weight to Dr. Ranson's opinions. Certainly, an ALJ can discount a treating physician's opinion if it is inconsistent with other substantial evidence, but where the record contains a variety of opinions, significant objective medical findings, and numerous clinical notes, some of which are consistent with the treating physician's opinions and some of which are arguably inconsistent, the ALJ should point to specific pieces of evidence that support the weight he or she ultimately affords the treating physician's opinion. Here, the ALJ discussed the opinions of Hugh Murray, P.T., Dr. Mukkamala, Dr. Bancoff, Dr. Swami, and Dr. Ranson. (Tr. at 22-23). He did not weigh Mr. Murray's opinion, but assigned "some weight" to the opinions of Dr. Mukkamala and Dr. Swami, and "little weight" to the opinions of Dr. Bancoff and

Dr. Ranson. The ALJ did not provide any specific reasons for the differences in weight, other than to state that the weight given was based upon the opinions' consistency or inconsistency with the record. Given that all of the opinions differed to some degree,[3] a more thorough explanation was necessary in order for the reviewing court to determine whether the ALJ complied with Social Security regulations and reached a decision supported by substantial evidence.

Moreover, the ALJ did not appear to consider any factor other than consistency when he weighed the medical source opinions. While the ALJ is not required to "mechanically recit[e] each factor," the reviewing court should be able to tell from the written decision "that all of the pertinent factors were considered." *McNeely v. Colvin,* Civil Action No.: 2:13–767, 2014 WL 4929437, at *10 (S.D.W.Va. Sept. 30, 2014). The ALJ makes no mention of Dr. Ranson's role as Claimant's treating physician, nor does he acknowledge that Dr. Ranson saw Claimant on multiple occasions for a period of time that exceeded one year. In July 2011, Dr. Ranson arranged for Claimant to see a neurosurgeon, Dr. Werthammer, for a second opinion because Claimant was not improving with conservative treatment. Dr. Werthammer noted that Claimant had an antalgic gait, a positive straight-leg raising test, some diminished muscle strength and

---

[3] For example, Mr. Murray opined that Claimant could lift thirty-five pounds occasionally and twenty-five pounds frequently; Dr. Mukkamala opined that Claimant could lift fifty pounds occasionally and twenty pounds frequently; Dr. Swami opined that Claimant could lift thirty-five pounds occasionally and twenty pounds frequently; Dr. Bancoff opined that Claimant could lift twenty pounds occasionally and ten pounds frequently; and Dr. Ranson opined that Claimant could lift ten pounds occasionally and ten pounds frequently. Dr. Mukkamala felt that Claimant should never climb, balance, stoop/squat or kneel/bend; Dr. Swami and Dr. Bancoff opined that Claimant should never climb ropes, scaffolds and ladders, but could do all of the rest occasionally; and Dr. Ranson felt Claimant should never crawl, but could occasionally climb, balance, stoop, kneel and crouch. Dr. Ranson believed that Claimant needed a sit/stand option; none of the other physicians mentioned this limitation. Dr. Mukkamala and Dr. Ranson opined that Claimant was limited in his ability to push/pull, but Drs. Bancoff and Swami disagreed. Dr. Mukkamala gave no opinion on Claimant's ability to sit, stand, and walk, but Dr. Bancoff limited Claimant to two hours of standing or walking and six hours of sitting, while Dr. Swami felt Claimant could do all of these for six hours each. Dr. Ranson agreed that Claimant's ability to walk or stand was limited to two hours, but he also needed to alternate those activities with sitting. Mr. Murray opined that Claimant could not drive more than one hour at a time. The ALJ did not reconcile these differences.

decreased sensation in the right leg. (Tr. at 1083). Based upon Claimant's examination and MRI results, Dr. Werthammer felt Claimant had radicular symptoms and recommended a lumbar microdiskectomy of the L4-L5 and requested authorization from Workers' Compensation to perform that procedure. These findings and the recommendation for surgery prompted Dr. Ranson to order Claimant to remain off-of-work until the microdiskectomy could be completed. (Tr. at 1082-84, 1094). As of May 4, 2012, the date of the last office note in the record, Claimant was still waiting for surgical authorization from Workers' Compensation. (Tr. at 1175). Despite Dr. Werthammer's findings, which seemingly corroborate Dr. Ranson's opinions regarding the severity of Claimant's lumbar condition, the ALJ did not address the supportability of Dr. Ranson's opinions in the context of the longitudinal record, nor in light of Dr. Werthammer's more recent evaluation, which post-dated the RFC opinions offered by the other medical sources.

Therefore, the undersigned **FINDS** that the ALJ's discussion of the weight given to the medical source opinions and his reasons for discounting the opinions of Claimant's treating source, Dr. Ranson, failed to comply with the relevant Social Security regulations and rulings. Without some explanation of the evidence underlying the ALJ's reasoning, the Court is simply not able to determine whether the ALJ had good reasons for giving Dr. Ranson's opinions "little" weight.

Despite this error, however, the undersigned further **FINDS** that the ALJ's ultimate decision of nondisability is supported by substantial evidence in light of the vocational expert's testimony in response to hypothetical questions, which incorporated Dr. Ranson's RFC opinions. As more fully discussed below, the vocational expert identified jobs in significant numbers in the regional and national economy that

Claimant could perform even when assuming all of the functional limitations found by Dr. Ranson. Accordingly, the ALJ's erroneous treatment of Dr. Ranson's opinions was harmless.

### C.  Hypothetical Questions to Vocational Expert

Claimant complains that the ALJ did not pose hypothetical questions to the vocational expert that accurately reflected all of Claimant's functional limitations; in particular, they failed to include the exertional and non-exertional limitations set forth in Dr. Ranson's Medical Source Statement of Ability to do Work-Related Activities form. Claimant contends that the ALJ incorrectly found Claimant capable of performing a full range of light work despite overwhelming evidence that Claimant had nonexertional limitations that significantly reduced the occupational base of light exertional work available to him.

At step five of the sequential process, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain*, 715 F.2d at 868-69. The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore*, 538 F.2d. at 574. In order to carry this burden, the Commissioner may rely upon the Grids, "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-92 (4th Cir. 1983); *see also*

20 C.F.R. §§ 404.1569, 416.969.

The Grids categorize jobs by their physical-exertion requirements; accordingly, "[a]t step 5 of the sequential evaluation process, RFC **must** be expressed in terms of, or related to, the exertional categories when the adjudicator determines whether there is other work the individual can do." SSR 96-8p, 1996 WL 374184, at *3 (emphasis added). However, the Grids consider only the exertional component of a claimant's disability, and even then, they do not contemplate all possible variations of exertional levels. 20 C.F.R. §416.969. For that reason, when a claimant has significant nonexertional impairments, has a combination of exertional and nonexertional impairments, or has an RFC that falls between exertional levels, the Grids merely provide a framework to the ALJ, who must give full individualized consideration to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* § 416.969; 20 C.F.R. Pt. 404, Subpart P, App'x 2 § 200.00(d); *see also Haynes v. Barnhart*, 416 F.3d 621, 629 (7th Cir. 2005) (recognizing that where RFC falls between sedentary and light work, Grids are used only as framework); *Hence v. Astrue*, No. 4:12cv1, 2012 WL 6691573, at *8 (E.D. Va. Nov. 30, 2012) (citing the Grids and SSR 83-12 in observing that where a claimant's RFC is between exertional levels, the Grids do not apply), report and recommendation adopted by 2012 WL 6697109 (E.D. Va. Dec. 21, 2012); *Frobes v. Barnhart*, 467 F. Supp. 2d 808, 821 (N.D. Ill. 2006) (stating that Grids only provide guidance where claimant falls between exertional levels).

Because the analysis subtly shifts at step five from an assessment of the claimant's limitations and capabilities to the identification of the claimant's potential occupational base, matching the appropriate exertional level to the claimant's RFC is the starting point. As the RFC is intended to reflect the **most** the claimant can do, rather

than the least, the ALJ expresses the RFC in terms of the highest level of exertional work that the claimant is generally capable of performing, but which is "insufficient to allow substantial performance of work at greater exertional levels." SSR 83-10, 1983 WL 31251, at *2; *see also* SSR 96-8p, 1996 WL 374184, at *2 (recognizing RFC represents most that individual can do given limitations). From there, the ALJ must determine whether the claimant's RFC permits him to perform the full range of work contemplated by the relevant exertional level. SSR 83-10, 1983 WL 31251, at *5. "[I]n order for an individual to do a full range of work at a given exertional level the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level." SSR 96-8p, 1996 WL 374184, at *3. If the claimant's combined exertional and nonexertional impairments allow him to perform some of the occupations classified at a particular exertional level, but not all of them, the occupational base at that exertional level will be reduced to the extent that the claimant's restrictions and limitations prevent him from doing the full range of work contemplated by the exertional level. *See* SSR 83-14, 1983 WL 31254, at *6 ("Where it is clear that additional limitations or restrictions have significantly eroded the exertional job base set by the exertional limitations alone, the remaining portion of the job base will guide the decision."). In making this determination, "the ALJ generally must accept evidence from a vocational expert, who, based on the claimant's age, education, work experience, and RFC, testifies whether there are jobs for such a person in the national economy." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51

(4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan*, 142 F.App'x at 720-21.

Contrary to Claimant's contention, the ALJ asked the vocational expert a hypothetical question that incorporated all of the exertional and non-exertional limitations found by Dr. Ranson. (Tr. at 66). The ALJ asked the vocational expert the following:

> What I'd like you to do now, Mr. Tanzey, is to assume an individual the claimant's age, education, and work history, who can perform work at the sedentary level who can stand and walk for two hours and sit for six hours in an eight-hour workday; who requires the option to alternate sitting and standing at will; who can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; who can occasionally balance, stoop, kneel, and crouch, but never crawl; and who must avoid concentrated – who can occasionally – also can occasionally reach; and who must avoid concentrated exposure to vibration, humidity, wetness, and hazards such

as moving machinery and unprotected heights. Would there be jobs that an individual with these limitations could perform?

(*Id.*). In response, the vocational expert testified as follows:

The Dictionary of Occupational Titles does not factor in a sit-stand option, and my testimony will be based upon my personal job analysis as well as reviewing and studying publications by other vocational experts. Your honor, with your hypothetical number two, all three positions that I mentioned in the sedentary classification would remain with hypothetical number two.

(Tr. at 67). The vocational expert added that his opinion would not change if the hypothetical question also required the individual to be able to use a hand-held device; namely, a cane.

Accordingly, even though the ALJ's RFC finding did not include all of the restrictions indicated by Dr. Ranson, the ALJ's second hypothetical question to the vocational expert incorporated all of the limitations included in Dr. Ranson's Medical Source Statement of Ability to do Work-Related Activities form.[4] Notwithstanding these additional restrictions, the vocational expert testified that Claimant was still capable of performing the tasks of three of the jobs he had previously listed in response to a hypothetical question that mirrored the ALJ's RFC finding. In light of this expert testimony, Claimant's criticism of the RFC finding and the hypothetical questions are without substance. *See Jones v. Colvin,* No. 1:10CV911, 2014 WL 4060563, at *5 (M.D.N.C. Aug. 14, 2014) ("[C]ourts have held that failure to specifically identify a limitation in a claimant's RFC constitutes harmless error when the hypothetical question posed to the VE included the limitation."); *Farrell v. Colvin,* Civil No. TMD 11–

---

[4] Dr. Ranson indicated in the form that Claimant's ability to push and pull was affected by his impairments, but Dr. Ranson failed to specify in what way and to what extent. (Tr. at 1074). In any event, the three jobs identified by the vocational expert included shipping and receiving router (DOT # 222.587-038); information clerk (DOT # 237.367-022); and stationary guard (DOT # 379.367-010). (Tr. at 65-66). None of these positions requires frequent pushing and pulling.

29952014 WL 1764928, at *13 n.15 (D.Md., Apr. 30, 2014) (finding that remand is not necessary when an error is harmless); *Gordon v. Colvin,* Civil Action No. 5:12–cv–2141–AKK, 2014 WL 2707989, at *4 (N.D.Ala. June 13, 2014); (finding that a remand to "allow the ALJ to incorporate the restrictions contained in the hypothetical question into his RFC finding would not change the ALJ's ultimate finding;" therefore, error is harmless and remand is unnecessary); *Pasco v. Comm'r of Soc. Sec.,* 137 F. App'x 838, 845 (6th Cir. 2005) (finding that the ALJ's error is harmless when the hypothetical question is more favorable to the claimant than the ALJ's RFC determination.); *Myrick v. Colvin,* No. 7:12–CV–359–FL., 2014 WL 1331205, at *6 (E.D.N.C. Jan. 22, 2014) (same); *Gill v. Colvin,* No. 7:12–CV–72–FL., 2013 WL 1817353, at *10 (E.D.N.C. Mar. 4, 2013) (same); *Barragan v. Colvin,* No. CV 12–6258–OP, 2013 WL 5467430, at *6 (C.D. Cal. Sept. 30, 2013) (ALJ's error in hypothetical questions was harmless where questions were more restrictive than RFC finding) (citing *Molina v. Astrue,* 674 F.3d 1104, 1115 (9th Cir. 2012) (an ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination)).

Therefore, the undersigned **FINDS** no merit in Claimant's challenge to the hypothetical questions. To the extent that Claimant criticizes the RFC finding for not incorporating Dr. Ranson's opinions set forth in the Medical Source Statement of Ability to do Work-Related Activities form, the undersigned also **FINDS** that any error by the ALJ in determining the Claimant's RFC was harmless given the second hypothetical question and the vocational expert's testimony in response, which supports the ALJ's ultimate determination of nondisability.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's motion for judgment on the pleadings, (ECF No. 14); **GRANT** Defendant's motion for judgment on the pleadings (ECF No. 15), **AFFIRM** the final decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** May 18, 2015

Cheryl A. Eifert
United States Magistrate Judge